**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

JOHNNY THOMAS ORTIZ II; JIMMIE GREGORY ROGERS JR.; and WELDON MURPHY

Plaintiffs,

v.

NORTH CAROLINA STATE BOARD OF ELECTIONS; ALAN HIRSCH, in his official capacity as Chair of the North Carolina State Board of Elections; JEFF CARMON III, in his official capacity as member of the North Carolina State Board of Elections; STACY EGGERS IV, in his official capacity as member of the North Carolina State Board of Elections; KEVIN N. LEWIS, in his official capacity as member of the North Carolina State Board of Elections; SIOBHAN O'DUFFY MILLEN, in her official capacity as member of the north Carolina State Board of Elections; and KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina State Board of Elections,

Defendants.

Civil Action No. 5:24-cv-00420-BO

**REPUBLICAN AMICI'S *AMICUS CURAE* BRIEF IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION**

***"I am disappointed with how we have handled this issue because it appears to me that this is yielding to political pressure from respective political parties and political action groups to keep other candidates and other parties who are not our parties off the ballot."***

**NCSBE Board Member Stacy Eggers IV**

**June 26, 2024 NCSBE Board meeting, 3:23:52.**

The Republican National Committee ("RNC") and the North Carolina Republican Party ("NCGOP") (collectively "Republican Amici") respectfully submit this brief in support of Plaintiffs' Emergency Motion for Preliminary Injunction (D.E. 8). The Court should grant Plaintiffs' Motion and require the North Carolina State Board of Elections to certify the Justice for All Party so that it can participate in the 2024 general election.

## INTRODUCTION

### I. Reasons that Republican Amici's Brief is Helpful to the Court.

Through this brief, Republican Amici seek to bring to the Court's attention additional factual circumstances and legal authority not included in Plaintiff's Memorandum in Support of the Emergency Motion for Preliminary Injunction (D.E. 10). This brief includes additional details about the NCSBE's consideration of the petitions by prospective new political parties this year, and contains legal arguments that (1) Defendants' actions impose a severe burden on Plaintiffs' First Amendment rights, establishing that strict scrutiny review of Defendants' actions applies; (2) the North Carolina State Board of Elections ("NCSBE") failed to narrowly tailor its investigation into the Justice for All Party's ("JFA Party") petitions; and (3) an analysis of the *Anderson / Burdick* balancing test if strict scrutiny is not applied to

the NCSBE's action. Republican Amici's briefing on these issues will be beneficial to the Court, as Republican Amici have included factual background that may be new to the Court, and have identified additional arguments in support of (1), (2), and (3).

## II. Summary of Republican Amici's Arguments.

The Board's denial of certification to the JFA Party involves serious infringements of constitutional rights by denying North Carolina voters the opportunity to vote for the candidate of their choice, impeding the JFA Party's and their members' (including Plaintiffs) associational rights, impeding the JFA Party's and their members' (including Plaintiffs) right to participate in the November 2024 election pursuant to N.C. Gen. Stat. § 163-98, and marginalizing the due process requirements in N.C. Gen. Stat. § 163-96.[1]

[1] The NCSBE's actions also appear to implicate Plaintiffs' Fourteenth Amendment right to equal protection under the law, as the NCSBE treated the JFA Party's petition to form a new party different from the We the People Party and the Constitution Party. All three parties submitted more than the statutorily-required number of signatures for formation which were thereafter verified by county boards of election, as required by N.C. Gen. Stat. § 163-96. (*See* July 9, 2024 NCSBE Press Release, "State Board Recognizes Constitution Party as Official NC Political Party", available at https://www.ncsbe.gov/news/press-releases/2024/07/09/state-board-recognizes-constitution-party-official-nc-political-party; July 16, 2024 NCSBE Press Release, "State Board Recognizes We The People as Official NC Political Party", available at https://www.ncsbe.gov/news/press-releases/2024/07/16/state-board-recognizes-we-people-official-nc-political-party (noting both that the "We The People" party was recognized and that the JFA Party was not recognized because "Members opposed to the party's recognition cited evidence of fraud in the signature gathering process, as well as the refusal of independent signature gatherers to comply with a subpoena for information from the Board.")). The NCSBE tries to distinguish its treatment of the JFA Party by noting that there was an investigation of fraudulent signatures on petitions, that the JFA Party did not itself collect a significant number of the signatures on its petitions, and that 18 petition signers contacted by the NCSBE said, in an unsworn telephone interview, that they did not sign the petitions. The signature investigation, however, appears to be directed at signatures that were not verified by the county chairs, the applicable statute does not require that the prospective political parties submit all the signatures, and 18 (or even 21) unsworn phone calls cannot effectively void 17,141 previously-verified petitions.

The NCSBE's violation of Plaintiffs' constitutional rights to vote, associate, and due process[2] weigh in favor of immediate action by the Court. The record is clear that, prior to the July 1, 2024 deadline for new political parties to certify to the NCSBE the names of persons chosen in the convention as the new party's candidates in the ensuing general election, *see* N.C. Gen. Stat. § 163-98, the JFA Party submitted well in excess of the number of verified petitions required by N.C. Gen. Stat. § 163-96. *See* N.C. Gen. Stat. 163-96 (a)(2) (authorization of petition process), (b) (petition requirements), and (c) (review by county board chairs); NCSBE chart from July 16, 2024 meeting, p.1 (indicating that 17,141 JFA Party petition signatures were "Signatures Previously Approved"), available at https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2024-07-16/New%20Party%20Petitions/SBE%20Inquiry/Summary%20Calls%20to%20JFA%20Signers%20at%20Random.pdf.[3] The rationale for the NCSBE majority's decision not to certify the JFA Party is a result of an outcome-determinative, constitutionally and statutorily-violative process. As such, the Court should grant Plaintiff's Emergency Motion for Preliminary Injunction.

---

[2] This brief does not contain an argument section regarding Plaintiffs' due process claim. Republican Amici support that claim, and note that Defendants attempts to distinguish *Green Party v. NC State Board of Elections*, 619 F.Supp.3d 547 (E.D.N.C. 2022) fail. Unlike *Green Party*, here the NCSBE violated Plaintiffs' due process rights by effectively voiding their signed petitions - and the other 17,398 verified signed petitions – due to unsworn telephone interviews with 18 petition signers who said they did not sign their petitions. The NCSBE's actions have deprived Plaintiffs of their right to vote through of its denial of their "the right of voters to associate and have candidates of their choice placed on the ballot," *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). Plaintiffs' interests are significant and, given the methodology pursuant to which the NCSBE voided the previously-verified petitions, the risk of erroneous deprivation in the Board's standardless process is high.

[3] All of the websites cited in this brief were last visited by counsel on July 28, 2024 or July 29, 2024.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. The NCSBE's Refusal to Recognize the JFA Party is the Product of an Outcome-Determined, Legally Suspect Process.

The process for recognition of a new political party in North Carolina is set by statute, N.C. Gen. Stat. §163-96. The statute contains a number of requirements for, e.g., the content of the petitions, the number of petitions, the dates on which the petitions must be submitted to the county boards of election and the NCSBE, and the process by which the county board Chairs are to review the signatures on the petitions. *See id.*; *see also Green Party v. NC State Board of Elections*, 619 F.Supp.3d 547, 553-54 (E.D.N.C. 2022) (detailing the requirements for certification of a new political party). The statutory requirements are meant to ensure that the petitions provide certain information to potential signatories about the petition and that, if signed, they contain signatures of North Carolina registered voters before being counted toward the statutory threshold. If the prospective new political party meets the statutory requirements – i.e., if the proposed political party uses the correct form for the petitions and the county boards conduct their signature matching analysis between the petitions and the corresponding registered voter's information and document that the proposed new political party has submitted more than the required verified 13,865 petitions – then the NCSBE "shall forthwith determine the sufficiency of petitions filed with it and shall immediately communicate its determination to the State chair of the proposed new political party." N.C. Gen. Stat. § 163-96(a)(2).

N.C. Gen. Stat. § 163-96 does not, however, provide a mechanism for the members of the NCSBE to look outside the petitions themselves for reasons to deny

approval of new political parties. This is logical given the timeline for determining approval of these petitions under the statute runs approximately 43 days, from May 17th (2 weeks before June 1) to July 1 (the date on which the new party is to certify to the NCSBE the names of persons chosen in the party's convention as candidates in the ensuing general election, see N.C. Gen. Stat. § 163-98). If the form of the petition complies with the statute, and the party submits a statutorily-sufficient number of verified petitions, then the new party must be certified. Neither N.C. Gen. Stat. § 163-96, nor § 163-22, authorize the NCSBE to conduct a standardless investigation resulting in the invalidation of 17,141 previously-verified petition signatures based on 18 phone calls.

**A. The JFA Party timely submitted its petition for recognition to the NCSBE and applicable county boards.**

During this 2024 election cycle, groups of North Carolinians sought to exercise their constitutional and statutory rights to petition to form three new political parties in the state: (1) the Constitution Party, (2) the We the People Party, and (3) the Justice for All Party. It is undisputed that each of them timely submitted thousands more signed petitions to the requisite county boards of election than the 13,865 called for in the statute and, ultimately, the county boards of election verified 14,445 signed petitions from the Constitution Party (D.E. 30-1, ¶16), 18,569 signed petitions from the We the People Party (D.E. 30-1, ¶19), and 17,362 signed petitions from the Justice for All Party (D.E. 30-1 ¶24). After the NCSBE's review, the number of petitions verified by both the county boards and the NCSBE were 14,022 for the Constitution Party (D.E. 30-1, ¶16), 18,309 for the We the People Party (D.E. 30-1, ¶19), and 17,141

for the Justice For All Party (D.E. 30-1 ¶24). As a percentage of the total number of petitions submitted to the county boards, the Constitution had approximately 73% of its petitions verified, the We the People Party had approximately 75% of its petitions verified, and the Justice for All Party had approximately 56% of its petitions verified.[4] *See id*.

**B. The NC Democratic Party and National Democratic Party Operatives submit self-serving challenges to the petitions from the JFA Party and the We the People Party.**

Immediately after the JFA Party and the We the People Party submitted their petitions to the NCSBE, they were subjected to partisan challenges from the North Carolina Democratic Party ("NCDP") and a Democratic Party-affiliated group, Clear Choice Action ("CCA"), likely because those prospective new political parties are running presidential candidates whose policies offer potentially attractive alternatives to Democratic Party voters. A timeline of the NCDP and CCA challenges are below:[5]

---

[4] In 2022, the Green Party was approved with 69% of its petitions being verified by the county boards of election at the same time that investigations of 2,653 fraudulent signatures were being conducted. *N.C. Green Party v. N.C. State Board of Elections*, 619 F.Supp.3d 547, 554-56 (E.D.N.C. 2022).

[5] This list likely does not include the totality of the Democratic Party-affiliated challenges submitted to NCSBE Board members. The documents cited are those that the NCSBE has publicly posted to its website. The documents that have been publicly posted, however, do not include, e.g., emails or other communications sent to or from NCSBE members or staff, which very likely occurred after the petitions were submitted on June 1, 2024. Indeed, when questioned during the North Carolina House Oversight Committee's meeting, NCSBE Board Chair Alan Hirsch testified that he had conversations with Morgan Jackson about the JFA Party's petition. (July 23, 2024, North Carolina House Oversight Committee Hearing, testimony of Alan Hirsch, Transcript pp. 32, 34 (available at https://webservices.ncleg.gov/ViewDocSiteFile/88619) Mr. Jackson, of course, is the co-founder of Nexus Strategies, the political consultant for Governor Roy Cooper, Attorney General (and candidate for Governor) Josh Stein, and the North Carolina Democratic Party, as well as the political consultant for numerous Democratic Party-aligned groups. *See* https://www.nexusstrategies.com/people/morgan-jackson (Nexus Strategies' biography of Mr. Jackson).

Democratic Party Challenges to We the People Party

- June 5, 2024: the NCDP sent a demand letter to the NCSBE[6] contending that the We the People's petition should be denied because the We the People Party is the political campaign of Robert F. Kennedy, Jr., and not a political party.

- June 7, 2024: the Elias Law Group, on behalf of CCA, sent a demand letter to the NCSBE[7] contending that the NCSBE must ensure that each county chair "check[ed] whether the signature [of the petition signer] resemble[s] that of the voter" prior to approval of the We the People Party's petition.[8]

- June 11, 2024: the Elias Law Group, on behalf of CCA, sent an additional 10-page demand letter to the NCSBE[9] contending that the petition from the We the People Party should be denied because (1) the petitions contained the incorrect address for the Chair of the We the People Party, (2) the purpose of the petitions was to get Robert F. Kennedy, Jr. on North Carolina's presidential ballot, not to form a new political party, and (3) We the People failed to inform signers of the petition of the general purpose and intent of the party.

We the People Party substantively responded on June 10, 2024, refuting the NCDP's issues.[10]

Democratic Party Challenges to Justice for All Party

- June 5, 2024: the NCDP sent a demand letter to the NCSBE[11] contending that the JFA Party's petition should be denied because the JFA Party is the political campaign of Dr. Cornel West, and not a political party. The letter acknowledged

---

[6] Available at https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2024-07-16/New%20Party%20Petitions/Objections/Letter%20to%20NCBSE%20re%20WTP%5B43%5D.pdf.

[7] Available at https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2024-07-16/New%20Party%20Petitions/Objections/NC%20Letter%20Re%20County%20Failure%20to%20Signature%20Check.pdf

[8] The NCSBE and county boards of election performed the signature analysis demanded by the Elias Law Group and required by statute prior to the June 26, 2024 meeting, and the final petition signature numbers reflect the signature analysis. (*See* D.E. 30-1 at ¶¶ 16 (Constitution Party), 19 (We the People Party) and 24 (Justice for All Party).

[9] Available at https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2024-07-16/New%20Party%20Petitions/Objections/2024.06.11%20-%20WTP%20Petition%20Issues%2C%20Exhibits%20(Final).pdf.

[10] Available at https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2024-07-16/New%20Party%20Petitions/Objections/We%20The%20People%20%20-%20NCSBE%20Response%20Letter_20240610.pdf.

[11] Available at https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2024-07-16/New%20Party%20Petitions/Objections/Letter%20to%20NCBSE%20re%20J4A%5B60%5D.pdf.

that it was essentially making the same argument that the NCDP made in opposing the We the People Party's petition.

- June 7, 2024: the Elias Law Group, on behalf of CCA, sent a demand letter to the NCSBE[12] contending that the NCSBE must ensure that each county chair "check[ed] whether the signature [of the petition signer] resemble[s] that of the voter" prior to approval of the JFA Party's petition.[13]

- June 13, 2024: the Elias Law Group sent a 29-page demand letter to the NCSBE[14] contending that the JFA Party's petition should be denied because (1) some signatures in support of the JFA Party were purportedly collected by people who opposed President Biden's re-election (an issue which is now moot), and (2) the acceptance rate of the JFA Party's petition signatures was lower than that of the Constitution Party and the We the People Party.

- June 24, 2024:[15], the Elias Law Group, on behalf of CCA, sent a redlined version of the June 13, 2024 letter to the NCSBE, correcting certain errors it identified.

- June 25, 2024: the day before the meeting of the NCSBE at which the NCSBE was to consider the JFA Party's petition for approval, the Elias Law Group, on behalf of CCA, sent a "Supplement" to their June 13, 2024 demand letter,[16] raising accusations of "Republican meddling" in the petition collection process based on a single social media post, despite acknowledging that they reviewed the campaign finance filings from Dr. West's campaign and could not find evidence of his payment for the same.

---

[12] Available at https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2024-07-16/New%20Party%20Petitions/Objections/NC%20Letter%20Re%20County%20Failure%20to%20Signature%20Check.pdf

[13] This is the same letter, cited in footnote 6, *supra*, regarding the signature match process.

[14] Available at https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2024-07-16/New%20Party%20Petitions/Objections/Letter%20to%20State%20Board_6_13_JFA%20-%20CORRECTED%20Redline_Redacted.pdf (redlined per June 24, 2024 correspondence).

[15] Available at https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2024-07-16/New%20Party%20Petitions/Objections/Errata%20to%20Jun%2013%20Letter%20to%20NCSBE%20re%20JFA%20Petition.pdf.

[16] Available at https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2024-07-16/New%20Party%20Petitions/Objections/Suppl%20to%20Jun%2013%20Letter_NCSBE%20re%20JFA%20Petition%20(6.25.24%20Final).pdf.

The JFA Party substantively responded on June 11, 2024 to the NCDP demand letter[17] and on June 25, 2024 to the CCA demand letter, refuting the NCDP and CCA claims.[18]

Nonetheless, on June 21, 2024, the Chairman of the NCSBE issued a request for "further information" to all three political party applicants.[19] This request sought detailed information about how each political party applicant addressed "the requirement in N.C.G.S. § 163-96(b) that 'the organizers and petition circulators shall inform the signers of the general purpose and intent of the new party.' " Each of the three political party applicants responded to the NCSBE Chair's Requests for Information.

### C. The NCSBE Considers the JFA Party Petition at its June 26, 2024 Meeting.

At the NCSBE's June 26, 2024 meeting, the NCSBE questioned Italo Medelius, Chair of the Justice for All Party of North Carolina, and spent much of its time on how the JFA Party solicited petitions, whether the JFA Party was formed for a "proper purpose," and the JFA Party's connections to third-party groups who collected

---

17 https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2024-07-16/New%20Party%20Petitions/Objections/JFA%20-%20Response%20to%20Challenge.pdf.

18 Available at https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2024-07-16/New%20Party%20Petitions/Objections/JFA%20Response%20to%20Clear%20Choice%20Action%20Challenge%206.25.24.docx.pdf.

19 Available at https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2024-06-26/New%20Party%20Petitions/NCSBE%20Request%20for%20Information%20-%20Constitution%20Party%2006212024.pdf (Constitution Party); https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2024-06-26/New%20Party%20Petitions/NCSBE%20Request%20for%20Information%20-%20Justice%20For%20All%20Party%2006212024.pdf (JFA Party); https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2024-06-26/New%20Party%20Petitions/NCSBE%20Request%20for%20Information%20-%20We%20The%20People%20Party%2006212024.pdf (We the People Party).

signatures on petitions for formation of the JFA Party. June 26, 2024 NCSBE Meeting ("June 26 Meeting") at 1:18:23 to 1:58:30 (available at https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2024-06-26/State%20Board%20of%20Elections%20Meeting-20240626%202000-1.mp4). The NCSBE members who ultimately voted against recognizing the JFA Party also spent significant time questioning Mr. Medelius about the intent or rationale of third-party signature collectors for the JFA Party petitions. (June 26 Meeting at 1:26:50 (playing video from X (formerly Twitter) account regarding Scott Presler); 1:27:34 to 1:33:40 (questions about the People Over Party organization); 1:44:00 to 1:51:00 (questions regarding signature collection by Scott Presler)).

The NCSBE denied a motion to approve the JFA Party. (D.E. 30 p.11). NCSBE Board Members Hirsch, Millen, and Carmon indicated that they believed additional investigation of both the JFA Party and the We the People Party needed to occur. (June 26 Meeting 3:25:50 to 3:27:30 (Hirsch) 3:32:16 to 3:33:34 (Millen); 3:34:15 (Carmon)). Rather than the NCSBE instructing staff on the scope of the investigation at the meeting, however, Chair Hirsch stated that he would poll each of the members individually after the meeting – so as to avoid North Carolina open meetings law – and then inform staff of the scope of the investigation. (June 26 Meeting 3:34:20). None of the materials posted publicly by the NCSBE indicate what the instructions were to NCSBE staff regarding the scope of the investigation.

### D. The NCSBE Conducts a Standardless Investigation, Contacting 49 of JFA Party's 17,362 Petitioners, After the June 26, 2024 Meeting.

The NCSBE did not substantively address the JFA Party's petition at its July 9, 2024 meeting, with the Chair stating that he had not had time to review the results of the Board's investigation. The NCSBE's July 9, 2024 meeting ended with the Board refusing to set its meeting date during which it would consider the JFA Party's (and the We the People Party's) petitions, although it ultimately reconvened on July 16, 2024.

Between the June 26, 2024 and July 16, 2024 meetings, the NCSBE and its staff subpoenaed records and sought interviews of petition signers. The NCSBE apparently sent a large number of subpoenas out after its June 26, 2024 meeting; those subpoenas, however, are not publicly available. With regard to the JFA Party, Italo Medelius, the Chair of the JFA Party of North Carolina, responded to a subpoena (without legal counsel), on six (6) days notice. Mr. Medelius notes in his response that he was sent the subpoena "over a holiday with six days to respond which contains a threat of county jail time" and provided responsive information.[20] Mr. Medelius's response continued to explain how the JFA Party complied with the statutory requirements for its approval as a new political party.

In addition to subpoenaing records, the NCSBE staff sought to interview signers of the JFA Party's petitions. NCSBE staff sought to contact two sets of petition signers: the first set, made up of 66 petition signers, was derived from the

[20] Available at https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2024-07-16/New%20Party%20Petitions/Subpoena%20Responses/Medelius%20-%20JFA%20Response.pdf.

Democratic Party-aligned demand letters[21]; the second set, made up of 250 petition signers, was derived from random signatures whose record included a phone number.[22] (*See generally* July 16 Meeting 31:00). While the interview notes have not been made public, the summaries of the interviews provided by NCSBE staff show the following:

The first five interviewees on the CCA list of contacts appear to have challenged that they rescinded their signature on the petition, as those boxes do not have information for "Why did you rescind your signature?"

Additionally, with regard to the 250 attempted random contacts from the NCSBE investigators, the questions asked of the JFA Party petitioners seem to be calculated to get the interviewee to doubt whether they signed or should have signed the petition due to its "purpose" (notwithstanding that the face of the petition reflected, in all capital letters, that it was for the formation of a new political party):

**Justice for All Interviews (28)**

| County | Confirmed Petition Signature | Did you understand the purpose of the petition? | What was your understanding of the purpose? | Did you understand it was for the support of a new political party? | Were you informed of the purpose and intent of party? | Other Comments |
|---|---|---|---|---|---|---|

(Summary of NCSBE interviews of petition signers, page 1, available at https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2024-07-

[21] The NCSBE summary of these calls is available at https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2024-07-16/New%20Party%20Petitions/SBE%20Inquiry/Summary%20Calls%20Statements.pdf.

[22] The NCSBE summary of these calls is available at https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2024-07-16/New%20Party%20Petitions/SBE%20Inquiry/Summary%20Calls%20to%20JFA%20Signers%20at%20Random.pdf.

16/New%20Party%20Petitions/SBE%20Inquiry/Summary%20Calls%20to%20JFA%20Signers%20at%20Random.pdf). The clear implication of the questions is that the JFA Party was being formed for an improper purpose, with the natural result that some petitioners, being called out-of-the-blue by NCSBE investigators with these questions, likely disavowed their signatures out of self-preservation concerns or to just get off the phone. Further, these people were called in July about something they signed months beforehand, meaning that there is some likelihood that they just did not remember accurately about whether they signed the petition.

Finally, out of the 250 attempted random petitioner contacts, NCSBE staff reported that 18 "did not sign" and 3 "did not recall signing", although none of those petitioners were further interviewed. Similarly, out of the 66 Democratic Party-aligned petitioner contacts sought to be made by NCSBE staff, only 12 said that they did not sign or did not recall signing, and none of those petitioners were interviewed.

**E. The NCSBE Meets on July 16, 2024 and Denies the JFA Party's Recognition.**

The NCSBE subsequently met on July 16, 2024 to consider the JFA Party and the We the People Party's petitions. The NCSBE voted to approve the We the People Party's petition, even though the Chair believed that there had been "subterfuge" as to the purpose and intent of the We the People Party.[23] Thereafter, the NCSBE considered the JFA Party's petition. (July 16 Meeting 30:20). The NCSBE majority

[23] July 16, 2024 NCSBE meeting video ("July 16 Meeting Video") at 27:32 and 30:10, available at https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2024-07-16/State%20Board%20of%20Elections%20Meeting-20240716.mp4.

who ultimately voted to deny the JFA Party's recognition spent much of the meeting and discussion challenging the purpose and intent of the people collecting the JFA Party's petitions, see e.g. July 16 Meeting 35:18 (Chair Hirsch noting that there are petition collectors "for whom we know nothing"), 37:14 (Chair Hirsch noting that signatures submitted without the "correct purpose and intent").

Subsequent to the NCSBE's denial of JFA's Petition, Plaintiffs filed this lawsuit and the Emergency Motion for Preliminary Injunction.

**F. Chair Hirsch and Executive Director Bell Testify to NC House Oversight Committee.**

Due to how the NCSBE has mishandled the petitions for formation of political parties, the North Carolina House Oversight Committee subpoenaed Chair Hirsch and Executive Director to testify on July 23, 2024.[24] Chair Hirsch submitted a written statement for the hearing, in which he described the reason for denying the JFA Party's recognition as:

> The Board has declined to certify Justice for All as a political party because it found that the party itself only submitted four thousand signatures, well below the required threshold. Outside groups submitted additional signatures, but a substantial portion of the citizens whose names appeared on the petitions advised the Board that they did not sign. Many others were not told the purpose of the group, as required by law. Subpoenas were issued to the outside petition gatherers seeking basic information, but they refused to provide information. County elections boards also identified fraudulent signatures, and that matter is currently under criminal investigation.

[24] Materials for the July 23, 2024 House Oversight Committee meeting are available at https://www.ncleg.gov/Committees/CommitteeInfo/HouseSelect/215/Documents/17676.

July 23, 2024 statement of NCSBE Chair Alan Hirsch, available at https://webservices.ncleg.gov/ViewDocSiteFile/88608.

The rationale offered by Chair Hirsch, however, is inconsistent with the law and the facts. It is undisputed that the NCSBE and county boards verified 17,141 signed JFA Party petitions. (D.E. 30 p. 10). The NCSBE's pre-verification of allegedly fraudulent signatures surely made sure that those suspect petitions were not included in the verified petitions. It is undisputed that the NCSBE's post-verification investigation of petitions signed by verified registered voters only attempted to contact 250 of the 17,141 petition signers, were only able to talk to 49 of those, and 18 said that they did not sign a petition at all. (D.E. 30 pp.13, 19-20). ***18 (or 21) out of 17,141 is not a "substantial portion of the citizens whose names appear on the petitions"*** – it is slightly more than one person out of every thousand people who signed the petitions and whose signatures were verified by both the county boards and the NCSBE.

Further, N.C. Gen. Stat. § 163-96 does not limit signature gatherers for prospective new political parties to people controlled by those political parties, and there is no evidence whatsoever that the allegedly fraudulent signatures identified by the county boards made up part of the verified 17,141 petitions. The purpose of the petitions was contained on their face, and it is a fundamental tenant of North Carolina law that signers of documents are presumed to have read them before signing. *See Goodwin v. Invs. Life Ins. Co. of N. Am.*2 N.C. 326, 330–31, 419 S.E.2d 766, 768–69 (1992) ("The law presumes that the [party] knew the contents of the

[document] she signed" ... "in the absence of any proof of fraud or mistake."). *See also* *Holzworth v. Nationwide Mut. Fire Ins. Co.*, 172 N.C. App. 170, 616 S.E.2d 29, 2005 WL 1804346, at *2 (2005) (holding that a party who signs a written instrument has a duty to read it before signing and "cannot avoid its effect on the ground that at the time she signed the paper she did not read it or know its contents." (alterations and quotations omitted)).

## ARGUMENT

North Carolina law sets out the requirements that prospective new political parties must meet in order for them to be approved by the NCSBE. N.C. Gen. Stat. § 163-96. The statute does not give the NCSBE unfettered discretion to re-review – and override – signature verifications by county boards of election and the NCSBE itself. The process used by the NCSBE to deny the JFA Party's petition was in conflict with, and in excess of, the requirements of N.C. Gen. Stat. § 163-96 and thereby violated Plaintiffs' constitutional rights.

The members of the NCSBE who voted against approving the JFA Party rested their decision on two purported issues: (1) that the NCSBE's post-verification investigation of signatories on the petitions[25] uncovered that 18 people (out of 17,362 verified petitions) that said, in a unsworn phone call, that they did not sign the

[25] N.C. Gen. Stat. § 163-96 requires that the county board chairs conduct signature investigations of the signers of petitions. The county board chairs did this analysis for ***every one*** of the 17,141 verified JFA Party petitions, which is 3,276 more than required. In contrast, the NCSBE's "investigation" of the JFA Party petitions only sought to contact 250 of the 17,141 petition signers and was only able to actually contact 49 signers. (*See generally* July 16 Meeting at 31:00). That the NCSBE would override the statutorily required signature matching program – conducted on all of the petition signers – in favor of results from unsworn telephone calls with 49 signers facially demonstrates the unlawfulness of the NCSBE's actions that were based thereon.

petition (and 3 more who said they did not remember), and (2) that the JFA Party was formed for an improper purpose. (NCSBE July 16, 2024 Meeting at 40:22-49 (Millen) (noting concerns about "how deep the pattern was"), 40:50 – 42:15 (Carmon) (noting concerns about how "there's enough ill intentions going around where people have used the [election] statutes to get around what their true intent is"), and 42:19 – 43:01) (noting that he had no confidence that "this was done legitimately" and the "number of signatures here required by statute have been met", and that the "failure of this outside group" added to his conclusion that the JFA Party did not meet the statutorily-required number of signatures). These purported reasons are unsupported by the facts and the law.

The NCSBE's decision has resulted in constitutional harms to Plaintiffs without justification, and without any meaningful opportunity for the JFA Party or its members (including Plaintiffs) to timely respond to issues raised by the Board's investigation. The NCSBE's denial of the JFA Party's petition is contrary to the requirements of § 163-96, lacks statutory support, and implicates serious First Amendment and procedural due process concerns.[26]

## I. <u>The NCSBE's Arbitrary Refusal to Recognize the JFA Party as a New Political Party Violates Plaintiffs' First and Fourteenth Amendment Rights to Vote and to Freedom of Association.</u>

Plaintiffs are likely to succeed on their claims for violation of the First and Fourteenth Amendments by Defendants. There are few constitutional rights more

[26] The arguments in this brief only address Plaintiffs' likelihood to succeed on the merits. Republican Amici do not address the other preliminary injunction factors (irreparable harm, balance of the equities, and public interest) because they are covered in Plaintiffs' Memorandum. (D.E. 9 p.12).

precious than the right to vote and freedom to associate. "The First Amendment protects the right of citizens to associate and to form [a] political part[y] for the advancement of common political goals and ideas." *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 357 (1997). The NCSBE's decision denying the JFA's petition has the effect of "limit[ing] the field of candidates from which [North Carolina] voters might choose," and therefore implicates the fundamental constitutional right to vote and protected freedom of association. *Anderson v. Celebrezze*, 460 U.S. 780, 786 (1983).

As Plaintiffs demonstrate, the Court is to analyze constitutional deprivations of the right to vote and freedom to associate under the *Anderson/Burdick* balancing test.[27] D.E. 9, pp.4-9. While the Republican Amici agree with Plaintiffs' general analysis of the *Anderson/Burdick* balancing test, we submit the following additional reasons that Plaintiffs' First Amendment claim is likely to succeed.

### A. The NCSBE's application of N.C. Gen. Stat. § 163-96 imposes severe burdens on Plaintiffs' First Amendment rights, triggering strict scrutiny.[28]

Due to the Board's actions, the JFA Party, the JFA Party's candidates, and potential JFA Party voters have been left with no meaningful options to express their

[27] The *Anderson/Burdick* framework prescribes a two-tier test: "a court must first determine whether [the] protected [First Amendment] rights are severely burdened. If so, strict scrutiny applies. If not, the court must balance the character and magnitude of the burdens imposed against the extent to which the regulations advance the state's interests. …" *Fusaro v. Cogan*, 930 F.3d 241, 257–58 (4th Cir. 2019) (citation omitted). In other words, "the severity of the burden imposed 'dictates the level of justification' required." *Johnston v. Lamone*, 801 F. App'x 116, 119 (4th Cir. 2020) (citation omitted).
[28] The NCSBE's brief appears to concede, "for the sake of argument", that its actions imposed a severe burden on Plaintiffs' First Amendment rights. (D.E. 30 p. 21).

political choices in the November 4, 2024 election. "[T]he severity of the burden imposed by an electoral regulation is a context-dependent inquiry." *Fusaro v. Cogan*, 930 F.3d 241, 259 (4th Cir. 2019). The Board has burdened Plaintiffs by refusing to recognize the JFA Party as a new political party in North Carolina, despite the JFA Party's compliance with the statutory prerequisites[29] and the county chairs' and NCSBE's verification of 17,141 signatures, thus preventing Plaintiffs from being able to associate as members of the JFA Party during the 2024 election process and from being able to vote for their preferred JFA Party candidates. The Board lacked both evidence and legal support for its decision to invalidate essentially the entirety of the JFA Party's already-verified signatures in order to not recognize it as a new political party.

The methodology used by the majority members of the NCSBE to reach the conclusion that they would not certify the JFA Party – that the staff's attempts to contact 250 petitioners, reaching 49 and with 18 saying that they did not sign the petition and another 3 saying they did not remember signing them,[30] and based

[29] Under N.C. Gen. Stat. § 163-96, the only requirements on the JFA Party were that it (1) acquire more than 13,865 signatures, (2) submit those signatures to the respective county board of elections for verification by May 17, and (3) submit those validated signatures, meeting the requisite quantitative threshold, to the Board by June 1. *See* N.C. Gen. Stat. § 163-96. The JFA Party met all those requirements, submitting 30,719 signatures to the county boards of elections by May 17, and then submitting 17,362 validated signatures to the Board on June 1, with the NCSBE ultimately verifying a total of 17,141 signed petitions. (D.E. 30 p.10). To the extent that the NCSBE seeks to refute the JFA Party's facial compliance with N.C. Gen. Stat. § 163-96, the burden should be on the NCSBE to prove, with evidence, that the JFA Party did not, in fact, meet the 13,865-signature threshold. The NCSBE has failed to make this evidentiary showing.

[30] The additional individuals who told NCSBE staff in the phone interviews that they did not remember whether they signed the petitions or that they did not have the purpose explained to them do not support the NCSBE's decision. The purpose of the petition is obvious on its face – formation of a new political party, the JFA Party. Also, the verified petition itself should govern over statement from an unsworn phone call to a person who does not remember whether he or she signed the petition.

thereon drawing the conclusion that, of the 17,141 verified petitions, 7,165[31] (41.8% of 17,141) are likely to have not been signed by the person named on the petition – is wholly unsupported. Such a thinly-evidenced approach, especially in the face of the already-verified signatures and when the NCSBE is using it to prevent JFA Party voters from voting for their preferred candidate, is unsupported by the law. The results of the Board's *ultra vires* actions plainly inflict a severe burden on Plaintiffs' First Amendment rights.

First, the NCSBE's decision inhibits the Plaintiffs' ability to participate in the JFA's Party's " 'ability to perform its primary functions,' such as organizing, recruiting members, and choosing and promoting a candidate." *See Green Party of Tenn. v. Hargett*, 767 F.3d 533, 547 (6th Cir. 2014) (burden more likely to be severe where primary functions impacted).

Second, the NCSBE's application of the statute, and the manner of imposing its decision, "impose[s] a severe burden [because] it left few alternate means of access to the ballot, restrict[ing] the availability of political opportunity." *Daunt v. Benson*, 999 F.3d 299, 311 (6th Cir. 2021) (cleaned up) (quoting *Anderson*, 460 U.S. at 793).

[31] Chair Hirsch's position is that, in voting to deny the JFA Party's petition, he was assuming that the percentage of petitioners who informed NCSBE investigators that they did not sign the JFA petition was could be reliably extrapolated to the entirety of the 17,141 JFA Party verified petitions. (July 23, 2024 North Carolina House Oversight Committee ("House Oversight Committee") Meeting, Alan Hirsch Written Testimony, available at https://webservices.ncleg.gov/ViewDocSiteFile/88608). It should be gravely concerning that the majority members of the NCSBE are using such a facially faulty analysis to void the verified petitions and prevent Plaintiffs from being able to vote for their party and candidate of choice. At the meeting of the North Carolina House Oversight and Reform Committee on July 23, 2024, Dr. Andy Jackson (PhD in Political Science from University of Nebraska-Lincoln) testified that, for multiple reasons, the NCSBE could not reliably extrapolate from their telephone interviews that over 40% of the verified signatures were from people who did not sign the petition. (House Oversight Committee, July 23, 2204 meeting, Transcript pp.4-5 (available at https://webservices.ncleg.gov/ViewDocSiteFile/88619)).

The NCSBE used the challenges from the NCDP and CCA to create a need for an extra-statutory investigation of JFA Party petitions and, on the thin reed of 18 people that purportedly said they did not sign their petitions (and three others who say they did not remember), the NCSBE invalidated them all and refused to recognize the JFA Party. (D.E. 1, ¶¶65, 67). As such, the NCSBE's unconstitutional application of N.C. Gen. Stat. § 163-96 leaves the JFA Party and its candidates no "alternative means of access to the ballot[,]", meaning that its prospective members and supporters (including Plaintiffs) cannot support or vote for them. *See Bullock v. Carter*, 405 U.S. 134, 149 (1972).

Third, the Board's decision eliminating the JFA Party's candidates from the November 5, 2024 ballot buttresses national party dominance in North Carolina, to the detriment of both JFA Party supporters (including Plaintiffs) and the electorate generally. "[T]he primary values protected by the First Amendment … are served when election campaigns are not monopolized by the existing political parties." *Anderson*, 460 U.S. at 794. Thus, "[t]he right to vote is 'heavily burdened' if that vote may be cast only for major-party candidates at a time when other parties or other candidates are 'clamoring for a place on the ballot.'" *Id.* at 787 (quoting *Lubin v. Panish*, 415 U.S. 709, 716 (1974); *Williams v. Rhodes*, 393 U.S. 23, 31 (1968)). With respect to the JFA Party and its supporters, "[t]he right to form a party for the advancement of political goals means little if a party can be kept off the election ballot." *Williams*, 393 U.S. at 31. Empowering the NCSBE, controlled by a majority of members from one of the major parties, with unfettered discretion to arbitrarily

reject new parties unconstitutionally allows the NCSBE to "freeze the political status quo," in service of its members political beliefs. *See Jenness v. Fortson*, 403 U.S. 431, 438 (1971). The burden of this unbounded discretion, manifested in the NCSBE decision not to certify the JFA Party (and what it put the Green Party through in 2022), is severe because it both "restrict[s] the ability of the [party] and its members to endorse, support, or vote for anyone they like" and it "directly limit[s] the party's access to the ballot." *See Timmons*, 520 U.S. at 363 (listing these as factors indicating severe burden).

Fourth, the NCSBE's decision was politically, rather than legally, motivated. "[P]olitical neutrality [is] important to determining whether a state election provision severely burden[s] First Amendment rights"—"[i]n other words, an election regulation that plausibly burdens First Amendment rights on the basis of viewpoint, political affiliation, or class should be subject to strict scrutiny." *Fusaro*, 930 F.3d at 261. The Democratic Party would benefit politically if the JFA Party does not appear on the ballot – the JFA Party presents a separate option for left-leaning voters in the General Election, especially its presidential candidate Dr. Cornel West. *See* Democrats Prepare Aggressive Counter to Third-Party Threats, New York Times, March 20, 2024 (available at https://www.nytimes.com/2024/03/20/us/politics/democrats-third-party-candidates.html) Thus, it is not surprising that the NCSBE's vote against certifying the JFA Party was only supported by its Democratic Party members.

The political undertones of the Board's decision are myriad: (1) the catalyst for the Board's investigation ***of verified petitions*** was requests for information followed

by complaints from a the NCDP and a national Democratic Party-affiliated group; (2) the county chairs and the NCSBE verified 3,497 more petitions than required and the NCSBE still refused to approve the JFA Party; and (3) the NCSBE majority spent much of their time attacking the JFA Party's desire to run Dr. Cornel West as a Presidential candidate as an improper purpose for which the party could be formed.

A concerted and coordinated effort was necessary to keep the JFA Party off the ballot – the Democratic members of the NCSBE coalesced according to their own political motivations. The NCSBE majority's repeated citing to the "purpose" of the JFA Party belies their own purpose: to discriminate against the JFA Party's desire to present an alternate choice to the Democratic Party's presidential candidate. Their refusal to certify the JFA Party discriminated against Plaintiffs' political viewpoint and constitutional rights in order to advance the majority's own political interest. This viewpoint discrimination is a severe burden on First Amendment rights, warranting strict scrutiny review. *Fusaro*, 930 F.3d at 261.

For these reasons, along with the fundamental arguments presented by Plaintiffs, the court should apply strict scrutiny to its review of the NCSBE's action.

**B. The NCSBE's application of N.C. Gen. Stat. §163-96 does not serve, and is not narrowly tailored to, a compelling state interest.**

Under strict scrutiny, the NCSBE cannot articulate a compelling state interest served by failing to certify the JFA Party as a political party. To provide more context on why the NCSBE's actions are not narrowly tailored, the Court must analyze the statutory authority provided to the NCSBE. N.C. Gen. Stat. § 163-96 authorizes the chairs of the county boards of election to determine the

validity of signatures on a petition—the statute provides no authority for the NCSBE, which is in a worse position to assess county voter rolls, to override verifications determined by county board chairs. *See* N.C. Gen. Stat. § 163-96(c)(1) ("[I]t shall be the [county board of elections] chairman's *duty* [t]o examine the signatures on the petition and place a check mark on the petition by the name of each signer who is qualified and registered to vote in his county." (emphasis added)). It also provides no authority for the NCSBE to effectively void petitions, once approved by both the county boards and the NCSBE, with no evidence whatsoever that the specific petitions that had already gone through an individualized review process were the product of fraud.

The NCSBE's new-found post-verification investigation authority, methodology, and resulting voiding of thousands of verified petitions is not narrowly tailored when "assessed in light of the totality of North Carolina's election laws." *McLaughlin v. N.C. Bd. Of Elections*, 65 F.3d 1215, 1223 (4th Cir. 1995). N.C. Gen. Stat. § 163-98 provides that a new political party must submit its candidates to the Board "no[] later than the first day of July prior to the general election" to be printed on the general election ballot. While § 163-96 does not expressly state that the Board's "forthwith" and "immediate" decision must occur prior to July 1, 2022, § 163-98 was enacted so that "[i]n the first general election following the date on which a new political party qualifies under the provisions of [N.C. Gen. Stat. §] 163-96, it shall be entitled to have the names of its candidates for national, State, congressional, and local offices printed on the official ballots." *Id.* § 163-98. Thus, for

North Carolina citizens to have any practical ability to form a functional new party, as is provided for by statute, the Board must determine the sufficiency of the petitions *before* July 1. Narrow tailoring, at a minimum, would entail a process that ensures the Board reaches a decision prior to the July 1 party nomination deadline—not a process that takes so long that the Board's determination becomes practically meaningless.

Most importantly, whatever interest the NCSBE may hold "in preventing voter fraud and upholding the integrity of elections" would be "demonstrably advance[d]—rather than hinder[ed]—" by allowing the JFA Party an opportunity to discuss or defend signatures containing alleged irregularities. *Self Advocacy Sols. N.D. v. Jaeger*, 464 F.Supp.3d 1039, 1053 (D.N.D. 2020) (citing *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191–92 (2008)) (reaching same conclusion for "allowing voters to verify the validity of their [absentee] ballots"); *accord Saucedo v. Gardner*, 335 F.Supp.3d 202, 221 (D.N.H. 2018) (same for allowing election officials to reach out to voters to confirm absentee ballot signatures). The practical problem for the NCSBE, to date, is that they have not, and cannot, identify over 3,497 verified signatures to be invalidated. Nevertheless, allowing the JFA Party an opportunity to review and defend suspect signatures would have, at a minimum, "further[ed] the State's interest in preventing voter fraud while ensuring that qualified voters are not wrongly disenfranchised." *Saucedo,* 335 F.Supp.3d at 220. "Likewise, improving the currently opaque, unreviewable process ... would only serve to enhance voter confidence in elections." *Id.* at 220–21. The

politically motivated, methodologically flawed post-hoc signature "re-review" process that the NCSBE has adopted undermines, rather than serves, state interests.

### C. Even if the NCSBE decision did not impose a severe burden, it would still fail under the Anderson/Burdick balancing test.

While Plaintiffs' Memorandum focuses on the severe nature of the burden imposed by the NCSBE's decision, D.E. 9 pp.6-8, that decision is also unconstitutional under the *Anderson/Burdick* balancing test even if this Court determined that the burden was not severe. Even where a burden imposed on First Amendment rights is not severe, the *Anderson/Burdick* balancing test still mandates that no matter how "slight th[e] burden may appear, the court must be satisfied that the burden is justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Fusaro v. Howard,* 19 F.4th 357, 368 (4th Cir. 2021) (cleaned up) (quoting *Crawford*, 553 U.S. at 191). Here, the burden on Plaintiffs' rights, if not severe, is at least "significant" or "serious" and is not justified by proportionately "weighty" state interests.

No state interest exists for denying ballot access to candidates and parties who comply with the state's ballot access requirements. Alternatively, any administrative interest North Carolina has in protecting its ballot from being overrun with candidates is not compelling either – the JFA Party has undertaken a significant and successful effort to comply with the statutory requirements and submitted 17,141 verified signatures in advance of the November 2024 general election. If the JFA Party fails to obtain two percent of the vote in the upcoming

election, the JFA Party's status as a certified party will be automatically terminated for future elections. N.C. Gen. Stat. § 163-97. And, as mentioned above, the state's interest in upholding election integrity is undermined, rather than served, by the NCSBE's post-verification investigation process and contrived reasons for denial of the JFA Party's petition. *See Anderson,* 460 U.S. at 789 ("[T]he Court must not only determine the legitimacy and strength of each of those [state] interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.").

Here, the NCSBE does not have clear statutory authorization to conduct a post-verification petition investigatory and invalidation process, let alone has it clearly articulated criteria by which it can determine when to invalidate signatures, previously verified by the county board chairs and the NCSBE, and give those impacted by such a decision to invalidate an opportunity to respond. The NCSBE's process for investigating and invalidating post-verification petitions is "standardless" and without "mechanisms in place to protect against arbitrary and unreasonable decisions." *See id.* The burden of such a standardless re-review is especially high when conducted by political actors, such as the members of the NCSBE, who have time and again displayed their own political motivations in reaching Board decisions. *Cf. Anderson*, 460 U.S. at 793 n.16 ("[B]ecause the interests of minor parties and independent candidates are not well represented in state legislatures, the risk that the First Amendment rights of those groups will be ignored in legislative decision making may warrant more careful judicial scrutiny.");

*Clingman v. Beaver*, 544 U.S. 581, 603 (2005) (O'Connor, J., concurring) ("[I]t must be recognized that [the State] is not a wholly independent or neutral arbiter. Rather, the state is itself controlled by the political party or parties in power, which presumably have an incentive to shape the rules of the electoral game to their own benefit."). For these reasons, even if the court determined no severe burden exists, Plaintiffs will still prevail under the *Anderson/Burdick* balancing test, and are likely to succeed on the merits of their claims.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' Emergency Motion for Preliminary Injunction should be granted.

**CERTIFICATE OF SERVICE**

I certify that on this 29th day of July 2024, I caused the foregoing document to be filed and served on all counsel of record by operation of the CM/ECF system for the United States District Court for the Eastern District of North Carolina.

*/s/ John E. Branch, III*

John E. Branch, III
N.C. State Bar No. 32598
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
2235 Gateway Access Point, Suite 220
Raleigh, NC 27607
Email: jbranch@bakerdonelson.com
Phone: (984) 844-7907

**CERTIFICATE OF COMPLIANCE WITH WORD COUNT**

I certify that Republican Amici's Memorandum in Support of Plaintiff's Emergency Motion for Preliminary Injunction complies with the Word Limit requirement contained in Eastern District of North Carolina Local Rules 7.2(f)(3), in that it contains 7970 words, counted using the word count function in Microsoft Word.

This the 29th day of July 2024.

*/s/ John E. Branch, III*

John E. Branch, III
N.C. State Bar No. 32598
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
2235 Gateway Access Point, Suite 220
Raleigh, NC 27607
Email: jbranch@bakerdonelson.com
Phone: (984) 844-7907