IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:24-CV-00420-BO

JOHNNY THOMAS ORTIZ II, *et al.*,　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　Plaintiffs,　　　)
　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　)　　　　　　O R D E R
　　　　　　　　　　　　　　　　　　)
NORTH CAROLINA STATE BOARD　　　　)
OF ELECTIONS, *et al.*,　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　Defendants.　　　)

Plaintiffs Johnny Thomas Ortiz II, Jimmie Gregory Rogers Jr., and Weldon Murphy are among the thousands of North Carolina voters who signed petitions to certify the Justice For All Party of North Carolina ("JFA") as new political party, which would allow JFA's candidates to appear on the 2024 general election ballot. JFA submitted more validated signatures than needed under the relevant statute, and its submissions were timely. But the North Carolina State Board of Elections ("NCSBE" or "the Board") deemed JFA's petitions not sufficient and voted not to certify JFA as a new political party.

Plaintiffs contend that the Board's decision violates their First and Fourteenth Amendment rights. They move this Court for preliminary injunctive relief. [DE 8]. JFA, its nominee for President, and its party chair (collectively, "Intervenors") move to intervene as plaintiffs in support of the motion. The Board opposes injunctive relief and defends its decision on the grounds that JFA failed to substantiate the required number of signatures. [DE 30]. For the reasons that follow,

the Court grants Intervenor's motion, and the Court grants in part and denies in part Plaintiffs' motion for preliminary injunction.

**BACKGROUND**

**I.    Factual Background[1]**

**A.    North Carolina's ballot access scheme for new political parties**

To be certified as a new party and place its candidates on the 2024 general election ballot, JFA had to comply with North Carolina's statutory scheme for new political parties set forth in N.C. Gen. Stat. §§ 163-96 and 163-98.

Section § 163-96(a)(2) sets the requirements for a group of voters to qualify as a new political party. That group of voters must file with the NCSBE petitions for forming a new political party that "are signed by registered and qualified voters . . . equal in number to on-quarter of one percent (.25%) of the total number of voters who voted in the most recent general election for Governor." § 163-96(a)(2). The petition must also "be signed by at least 200 registered voters from each of three congressional districts in North Carolina." *Id.* Such petitions must be filed with the Board before 12:00 p.m. on the 1 June preceding the general election in which the new party wishes to participate. *Id.*

Once the petitions are filed, the "State Board of Elections shall forthwith determine the sufficiency of petitions filed with it," notifying the state chair of the proposed new political party of its decision immediately afterwards. *Id.* As for the petitions, § 163-96(b) governs their requirements. That section starts by stating the specific heading that is to appear on each petition for the creation of new political party. It goes on to list additional typographical and stylistic rules.

---

[1] The Court derives the facts from the pleadings and materials entered into the record by the parties as well as matters of public of public record those materials reference. The Court may take judicial notice of matters of public record. *Justice 360 v. Stirling*, 42 F.4th 450, 455 (4th Cir. 2022); *see also* Fed. R. Evid. 201.

2

Adding to those requirements for the form of the petition, § 163-96(b) commands that "organizers and petition circulators shall inform the signers of the general purpose and intent of the new party." It then finishes with limitations on the proposed new parties' names and states that the Board must reject petitions for non-compliance with the naming requirements.

To determine whether a party has satisfied these requirements, the Board draws on several sources. To determine whether the petition sheets contain all the required information, the Board simply looks at the petition sheets. Confirming that the purpose and intent requirement is satisfied, however, requires the Board to go beyond the petitions. The Board's practice is to look at documents or statements submitted by the parties since they have the information to demonstrate compliance. Such materials include training materials provided by the parties to their signature gathers, which evince whether the parties' signature gatherers explained the purpose and intent of the party. (*See* Cox Decl. ¶ 11 [DE 30-1]).

Although the petitions must be filed with the Board by the 1 June 2024 deadline, there is a critical preceding step with its own deadline. The proposed new party must submit its petitions "to the chairman of the county board of elections in the county in which the signatures were obtained no later than 5:00 p.m. on the fifteenth day preceding" the 1 June deadline to file with the Board. § 163-96(c). For the timely submitted petitions, the chairman of each county board then proceeds to "examine and verify the signatures." *Id.* To fulfill this duty, the chairman must first "examine the signatures on the petition and place a check mark on the petition by the name of each signer who is qualified to register to vote in his county." § 163-96(c)(1). The chairman then must "attach to the petition a signed certificate stating that the signatures on the petition have been checked against the registration records and indicates the number found qualified and registered to vote in his county." § 163-96(c)(2). Finally, the chairman returns the petition to the party and adds the

3

new certificate. § 163-96(c). The county boards have two weeks to complete this process from the day the proposed new party submits its petition. *Id.*

If the Board certifies the new political party, the party is "entitled to have the names of its candidates for national, State, congressional, and local offices printed on the official ballots" for "the first general election following the date on which the new party qualifies." § 163-98. The new political party must choose its candidates by convention. *Id.* Following the convention, the president of the convention must certify to the Board the individuals chosen as the new party's candidates. And the deadline for that submission is 1 July. *Id.*

To sum up, for a group of voters to be certified as a new political party in time to participate in the 2024 general election, the proposed new party must: (1) collect sufficient valid signatures on petitions that meet § 163-96(b)'s requirements, including "informi[ng] signers of the general purpose and intent of the new party," § 163-96(b); (2) submit those petitions to the county boards of elections before 5:00 p.m. on 17 May 2024 so the county boards of elections could validate them; (3) submit those petitions and their new attached certificates to the Board by noon on 1 June 2024; and, (4) nominate candidates in a convention and submit their names to the Board by 1 July 2024.

### B. The Board declines to certify JFA as a new political party.

In January 2024, JFA began its efforts to gather signatures to meet the 17 May 2024 deadline to submit signatures to the county boards. JFA submitted most of its sheets to the county boards around the end of April beginning of May. To be certified as a new political party for the 2024 general election, JFA needed to hit 13,865 verified signatures. JFA ultimately submitted 17,141 verified signatures, thus clearing that threshold a cushion of over 3,200 signatures. JFA's signatures also satisfied the three congressional districts requirement. During the review process,

4

however, several issues were raised. (*See* Brinson Bell Test. at 6, 15 [DE 38-4]; Cox Decl.¶¶ 4, 24.)

First, at some point during the verification process, a county board of elections raised concerns that a JFA petition sheet had potentially fraudulent signatures. That county board was tipped to the possibility of fraud when the name of a local leader for recognized major political party appeared on the petition sheet. The county board contacted the purported signer, who confirmed that she didn't sign the petition. The county director told the Board, and it began a criminal investigation into the gathering of those signatures. Additionally, other counties reported signs of fraudulent signatures on JFA petitions to the Board. The counties concerned with fraudulent signatures were Wake, Edgecombe, Watauga, Beaufort, and, perhaps, Mecklenburg. None of the signatures suspected as fraudulent were validated, so those signatures were not included in JFA's total signature count. (*See* Brinson Bell Test. at 10; Cox Decl. ¶¶ 14, 25; Excerpts of North Carolina House Oversight & Reform Committee Hearing Test. 107:11–20, 107:23 [DE 38-2] (hereafter "House Test").)

Second, outside groups filed objection letters regarding JFA's petitions. Specifically, Clear Choice Action claimed that 76 county boards failed to conduct the signature matching needed to verify JFA's petition. Although § 163-96 has no official process for third-party groups to challenge or object to the certification of a new political party, the Board's policy is to review all allegations and evidence of violations. (*See* Clear Choice Action, *13 June Letter to NCSBE*, at https://dl.ncsbe.gov/?prefix=State_Board_Meeting_Docs/2024-07-16/New%20Party%20Petitions/Objections/ (last accessed Aug. 12, 2024) ; Brinson Bell Test. at 17; Cox Decl. ¶ 10.)

5

On Clear Choice Action's prompting, the Board conducted its own review of the county boards' signature validation efforts. That review revealed that Clear Choice Action misread the publicly reported data. Instead of the 76 county boards alleged to have conducted no signature matching, the actual number of county boards did not match petition signer's signatures to the signatures in their voter registration records was nine, maybe ten. On the Board's instructions, those counties completed their signature comparisons by 19 June and submitted updated totals to the Board. (*See* Brinson Bell Test. at 9–10; Cox Decl. ¶ 13; House Test. 75:15-24, 106:11–15.)

At the Board's 26 June 2024 meeting, the Board addressed the sufficiency of JFA's petitions. JFA's party chair, Italo Medelius, appeared and fielded questions from the Board. Much of the Board's inquiry concerned JFA's control over the signature gathering. Medelius explained that JFA operates as a volunteer, grassroots outfit. It conducted multiple trainings for petition circulators and provided instructional materials and guidance. Throughout the signature gathering process, JFA was aware that the sufficiency of its petitions depended, in part, on its ability to demonstrate not only its intent to create a long-term political organization but also that it informed petition signers of JFA's intent and general purpose. To that end, JFA referenced an internal e-mail, which it submitted to the Board, containing materials and a "script" for petition circulators.[2]

The Board also asked Medelius about JFA's connection with People Over Parties ("POP"), a non-partisan group aimed at promoting voter choice. During the signature-gathering process, POP, through its general counsel, contacted JFA about gathering petitions on JFA's behalf. JFA admitted that it didn't have control over POP or its efforts, but it did authorize three of POP's

_____

[2] (*See* NCSBE, *26 June 2024 Board Meeting*, at https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2024-06-26/State%20Board%20of%20Elections%20Meeting-20240626%202000-1.mp4 (last accessed Aug. 12, 2024); JFA, *Responses to NCSBE*, https://dl.ncsbe.gov/?prefix=State_Board_Meeting_Docs/2024-06-26/New%20Party%20Petitions/ (last accessed 12 August 2024)).

6

circulators to submit petitions on JFA's behalf. Several weeks before the 26 June meeting, POP's general counsel, Paul Hamrick, responded to a request from NCSBE staff for information relating to its efforts to collect signatures for JFA. POP submitted training materials for its petition circulators detailing its efforts to convey the purpose and intent requirement. Responding to a later subpoena, POP also submitted a declaration from David Saddler, the manager of the canvassing and petition management company POP engaged to collect signatures for JFA further illuminating POP's efforts to comply with § 163-96. (*See* House Test. at 6:14–10; Cox Decl. ¶ 27; Hamrick Decl. ¶¶ 2–5, 7–5, Ex. D. at 5, Ex. A to Ex. D ¶¶ 2, 3, 7–9 [DE 38-1].)

While the Board continued to investigate JFA's petition, the statutory deadline edged closer. Notwithstanding the uncertainty about its status as a new political party, JFA went ahead and held a nominating convention to select its candidates for the November 2024 general election. It selected Dr. Cornel West as its nominee for President of the United States, Dr. Melina Abdullah as its nominee for Vice President of the United States, and Frankie Lee Gist as its nominee for Mayor of Winston Salem, North Carolina. JFA's candidate list was timely submitted. (*See* Compl. ¶ 28, 29; Cox Decl. ¶ 31; Intervenor's Compl. ¶¶ 17,18 [DE 44-1])

Following the 26 June meeting, the Board directed NCSBE staff to further their investigation into JFA's petitions. As part of this investigation, NCSBE staff attempted to contact petition signers. They reached out first to 66 signers who signed affidavits—submitted by Clear Choice Action—stating that they wished to withdraw their signatures. Of the 66, 10 responded. Staff then reached out to 250 petition signers, who were randomly selected from a list of registered voters whose registration records included a phone number. Of the 250 signers contacted, 49 responded: 18 stated they did not sign, 3 stated they didn't remember signing, and 28 confirmed they did sign. The Staff then interviewed those 28 voters: 15 of the 28 responded that they

7

understood the purpose of the petition and that the petition was for the support of a new political party. What's more, of those 15 signers, 13 confirmed they were informed of the purpose and intent of the party with the other two stating they believed so. (*See* NCSBE, *Summary of Calls to JFA Petition Signers*, at https://dl.ncsbe.gov/?prefix=State_Board_Meeting_Docs/2024-07-16/New%20Party%20Petitions/SBE%20Inquiry/ (last accessed Aug. 12, 2024); Brinson Bell Test. at 17; Cox Decl. ¶¶ 27, 29.)

On 16 July 2024, the Board met to revisit JFA's certification for a final time. The Board considered the results of the staff's investigation, including the survey results discussed above. At the end of the meeting, the Board voted 3-2 against certifying JFA as a new political party. According to Chairman Hirsch, the Board's decision not to certify as a new political party was because (1) JFA itself submitted only 4,00 signatures with the remaining signatures coming from outside groups; (2) a "substantial portion" of the voters whose names appeared on the petition advised the Board that they did not sign; (3) "many others" were not informed of JFA's purpose; (4) the outside petition circulators were subpoenaed but did not respond; and (5) county boards identified fraudulent signatures. (*See* Hirsch Test. at 1 [DE 38-4]; Cox Decl. ¶¶ 29, 30; Brinson Bell Test. at 17; House Test. 81:11–21.)

Plaintiffs Johnny Thomas Ortiz II, Jimmie Gregory Rogers Jr., and Weldon Murphy are registered North Carolina Voters who signed petitions to form JFA as a new political party. Plaintiffs allege that N.C. Gen. Stat. §§ 163-96 and 163-98, as applied, violates their First and Fourteenth Amendment rights. (*See* Compl. ¶¶ 7–9, 72–80; Ortiz Decl. [DE 8-1]; Rogers Decl. [DE 8-1]; Murphy Decl. [DE 8-3].)

Plaintiffs have sued the NCSBE, the executive agency responsible for administering election laws in North Carolina. Plaintiff have also sued following individuals associated with the

8

NCSBE in their official capacities: Defendant Karen Brinson Bell, NCSBE's executive director; Defendant Alan Hirsch, NCSBE's chairman; Defendant Jeff Carmon, NCSBE's secretary; Defendants Stacy Eggers IV, Kevin N. Lewis, and Siobhan O'Duffy Millen, all NCSBE members. (Compl. ¶¶ 10–16)

## II. Procedural Background

On 22 July 2024, Plaintiffs filed their complaint for declaratory and injunctive relief. [DE 1]. Contemporaneous with their complaint, Plaintiffs moved for preliminary injunctive relief. [DE 8]. On 23 July 2024, this Court noticed a hearing on Plaintiff's motion for preliminary injunction on 30 July 2024 at the United States Courthouse in Elizabeth City, North Carolina. [DE 11]. Given the impending hearing, the Court issued a briefing schedule and ordered Plaintiffs to serve the same on the Defendants via e-mail. Plaintiff's counsel had until 12:00 p.m. on 24 July 2024 to file a certification to that effect. The Court also directed the Clerk of Court to serve that Order on the Defendants via mail at the address listed in the summons attached to the complaint. On 21 July, Plaintiffs' counsel filed a certificate of service. [DE 12].

In the period between the motion and the response, Speaker Timothy Moore, in his official capacity as Speaker of the North Carolina House of Representatives, Representative Destin Hall, in his official capacity as Chairman of the Committee on Rules, Calendar, and Operations of the House, and Representative Grey Mills, in his official capacity as Chairman of Committee on Election Law and Campaign (collectively, "the Legislators"), moved to file a brief as amici curiae. [DE 26]. On 26 July 2024, the Court granted the Legislator's motion and directed the Clerk to file their brief. [DE 31].

On 26 July 2024, Defendants responded in opposition to the Plaintiff's motion for preliminary injunction. [DE 30]. After the response, the Court received additional motions to file briefs as amicus curiae. On 27 July 2024, Clear Choice Action moved file a brief as amicus curiae

in opposition to Plaintiff's motion for preliminary injunction. [DE 34]. The Court granted the motion and directed the Clerk to file Clear Choice Action's amicus brief. [DE 41]. On 29 July 2024, the North Carolina Republican Party and the Republican National Committee moved to file a brief as amici curiae in support of Plaintiff's motion for preliminary injunction. [DE 37]. The Court granted the motion and directed the Clerk to file the attached brief. [DE 47].

Between the response and reply, Dr. Cornel West, Italo Medelius, and JFA (collectively "Intervenors") moved to intervene as of right under Federal Rule of Civil Procedure 24(a)(2), or, alternatively, for permissive intervention under Rule 24(b). [DE 44]. Intervenors filed a proposed complaint as required by Rule 24(c). [DE 44-1]. At the 30 July 2024 hearing on Plaintiffs' motion for preliminary injunction, the Court announced from the bench that Intervenors' motion to intervene would be granted in a written order to follow (this Order), and the Court allowed counsel for Intervenors to argue in support of the preliminary injunction.

On 29 July 2024, Plaintiff's replied. [DE 38]. On 30 July 2024, the Court heard Plaintiffs' motion for preliminary injunction. Counsel for Plaintiffs, NCSBE, and the Intervenors argued on their clients' behalf. The motion for preliminary injunction [DE 8] is ripe for decision.

## ANALYSIS

### I.    Motion to Intervene

Dr. Cornel West, Italo Medelius, and JFA (collectively, "Intervenors") move to intervene in this action as "of right" under Federal Rule of Civil Procedure 24(a)(2), or, in the alternative, to permissively intervene under Rule 24(b)(1)(b).

Under Rule 24(a)(2), "the court must permit anyone to intervene who (1) [o]n timely motion, (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impeded the movant's ability to protect its interest, (3) unless existing parties adequately represent that

10

interest." *Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 190 (2022) (quoting Fed. R. Civ. P. 24(a)(2)). The Court concludes that Intervenors have satisfied this standard. Accordingly, they are permitted to intervene as plaintiffs.

First, the intervenor-plaintiff's motion is timely. "Timeliness is a central consideration when deciding a motion to intervene, and a movant's failure to seek intervention in a timely manner is sufficient to justify denial of such motion." *Scott v. Bond*, 734 F. App'x 188, 191 (4th Cir. 2018). Timeliness is subject to the district court's discretion. *Alt v. EPA*, 758 F.3d 588, 591 (4th Cir. 2014). District courts considering timeliness look at three factors: (1) how far the underlying suit has progressed; (2) prejudice to the parties from any delay; and (3) why the movant was tardy. *Id.*

No need to dwell on timeliness here given the suit has only just begun. The Motion to Intervene was filed before Plaintiff's filed their reply brief, a short window considering the accelerated briefing schedule. As a result, the Court finds no prejudice to the Defendants and there is no tardiness that needs explanation.

Second, intervenors have an interest that is the subject of the action and are so situated that disposing of the action may impair or impede their ability to protect their interests as a practical matter. "While Rule 24(a) does not specific the nature of the interest required for a party to intervene as a matter of right the Supreme Court has recognized that 'what is obviously meant is significantly protectable interest." *Teague v. Bakker*, 931 F.2d 259, 261 (4th Cir. 1991) (quoting *Donaldson v. United States*, 400 U.S. 57, 531 (1971) (cleaned up)). A "significantly protectable interest" can be found where proposed intervenors "stand to gain or lose by the direct legal operation of the district court's judgment." *Id.* Intervenors' core interests, indeed their survival as players in the 2024 general election, are at stake here. They directly stand to either gain or lose

11

because of the Court's judgment. If this Court enjoins the Board, JFA and its candidates can appear on the ballot; if this Court concludes that no injunction is warranted, JFA will be effectively shut out of the election. Therefore, the Court finds that Intervenors' have demonstrated the sufficiency of their interest relating to the subject matter of the action and that interest would be practically impaired if Intervenors were denied the ability to intervene.

Third, the existing parties do not adequately represent Intervenors' interest. This requirement has been described as "presenting proposed intervenors with only a minimal challenge." *Berger*, 596 US. at 195; *see also Teague*, 931 F.2d at 262 (reversing district court's ruling on intervention as of right in part because "district court failed to heed the Supreme Court's determination that the burden on the applicant of demonstrating a lack of adequate representation should be treated as minimal." (citation and internal quotation marks omitted)).

Intervenors argue that Plaintiffs—North Carolina voters who signed the petition to certify JFA as a new political party—do not adequately represent their interests. Plaintiffs acknowledge that Plaintiff's motion for preliminary relief is intended to benefit the intervenors directly. Intervenors contend, however, that they not the Plaintiffs possess relevant evidence on JFA and Dr. West's compliance with the statutory requirements for certification as a new political party. The Court finds this persuasive. To be sure, Plaintiffs and Intervenors seek the same long term and short-term goals—putting JFA and Dr. West on the 2024 general election ballot and forming a new political party. But only the intervenors are in full control of the record relating to the Board's certification effort. This informational asymmetry prevents Plaintiffs from adequately representing intervenors.

Finally, even if the Court is mistaken and plaintiff-intervenors are not entitled to intervene as of right under Rule 24(a)(2), the Court permits them to intervene permissively under Rule 24(b).

Rule 24(b) authorizes the Court, on a timely motion, to "permit anyone to intervene who . . . has a claim or defense that share with a main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). "Liberal intervention," the Fourth Circuit notes, "is desirable to dispose of as much of a controversy involving as many apparently concerned person as is compatible with efficiency and due process." *Feller v. Brock*, 802 F.2d 722, 729 (4th Cir. 1986) (citations and internal quotations omitted).

Motions for permissive intervention are committed to the discretion of the district court. *See, e.g.*, *Smith v. Pennington*, 353 F.3d 884, 892 (4th Cir. 2003) ("Typically, a decision [on] permissive intervention under Rule 24(b) lies within the sound discretion of the trial court." (citation and internal quotations omitted)); *Cf. Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 278–79 (2022) (discussing permissive intervention generally). "In exercising [that] discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).

In their Motion to Intervene [DE 44] and memorandum in support [DE 45], Intervenors implore the Court to allow them to intervene and support Plaintiff's request for declaratory and injunctive relief as necessary to remedy the Board's constitutional violations. As discussed above, the Court sees no timeliness concerns and there is no reason to think that intervention would unduly delay or prejudice the existing parties. Furthermore, Intervenors' will raise common questions of law and fact in prosecuting this suit. Taking into account the factors for permissive intervention, the Court finds Intervenors' arguments for permissive intervention compelling, and allows them to permissively intervene in this case.

## II.    Motion for Preliminary Injunction

Before reaching the merits of Plaintiffs' motion for preliminary injunction, the Court addresses Defendants' arguments that this Court lacks jurisdiction to hear this case.

13

A.    **Jurisdiction**

(1) **Standing**

Article III of the Constitution limits the jurisdiction of the federal courts to "Cases" and Controversies." U.S. Const. art. III, § 2. Standing enforces this limitation by "ensuring judges attend to actual harms rather than abstract grievances." *United States v. Texas*, 599 U.S. 670, 686 (2023). "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

The requirements for standing are familiar and firmly fixed. To establish standing, a plaintiff must demonstrate, (1) that plaintiff has suffered or will likely suffer and injury in fact, (2) that the injury likely was caused or will be caused by the defendant, and (3) that the injury likely would be redressed by the requested judicial relief. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). Only one plaintiff need establish standing for the court to invoke jurisdiction over the suit. *Nelson v. Warner*, 12 F.4th 376 (4th Cir. 2021); *Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 209–10 (4th Cir. 2020).

Defendants dispute that Plaintiffs satisfy the first step—sufficient injury in fact. "Article III require[es] that the plaintiff's injury in fact be 'concrete'—that is, 'real, and not abstract.' " *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016)). What's more, that injury must be particularized and not an abstract generalized grievance. *See Hollingsworth v. Perry*, 570 U.S. 693, 706 (2013).

Plaintiffs have suffered a concrete, individualized harm because of the Board's decision not to certify Justice For All as a new political party. Plaintiffs demonstrate that they wish to associate with JFA. Furthermore, there is nothing hypothetical or speculative about their intent to associate with JFA. They have advanced this interest by signing petitions, exercising their First Amendment rights of association. The Board's decision not to certify JFA allegedly violates those

14

rights. That is sufficiently concrete. To be sure, thousands of North Carolina voters have done likewise, but widely shared injuries still constitute injuries in fact if concrete. *See, e.g.*, *FEC v. Atkinson*, 524 U.S. 11, 24–25 (1998).

Because Plaintiffs have suffered sufficient constitutional injury this Court has jurisdiction over the suit and no further inquiry is necessary. *See Md. Shall Issue* , 971 F.3d at 209. Yet it also clear that Intervenors West and JFA also show a constitutionally sufficient injury in fact. "To have candidate standing, a plaintiff 'must at least show that he is likely to [run] in the reasonably foreseeable future,' meaning that he 'is able and ready to do so.' " *Goldman v. Brink*, No. 3:21-cv-420, 2022 WL 2024745, at \*13 (E.D. Va. June 6, 2022) (three judge court) (quoting *Carney v. Adams*, 592 U.S. 53, 60 (2020) *aff'd in relevant part and modified on other grounds*, 41 F.4th 366 (4th Cir. 2022). West has done more than show that he is likely to run for office in the foreseeable future. He's running for office and has been nominated by JFA to be its candidate for president. The only thing keeping West off the ballot in North Carolina is the Board's decision not to certify JFA. That is a sufficiently concrete injury in fact. *See Yang v. Kellner*, 458 F. Supp. 3d 199, 206–07 (S.D.N.Y. 2020), (finding concrete injury in fact where election law removed candidate from ballot and denied him "the opportunity to compete for elective office") *aff'd* 960 F.3d 119 (2020). What's more, the alleged harm from N.C. Gen. Stat. §§ 163-96 and 163-98, as applied, is not only constitutionally sufficient injury in fact for West but also for the JFA. *See Nelson v. Warner*, 472 F. Supp. 3d 297, 306 (S.D. W. Va. 2020) (concluding that candidate and party had suffered a sufficient injury in fact to have standing to challenge ballot access law)

### (2) State sovereign immunity

Defendants raise an additional challenge to this Court's Art III jurisdiction: sovereign immunity. State sovereign immunity act as constitutional limitation on the power of the federal courts. *Sossamon v. Texas*, 563 U.S. 277, 284 (2011); *Alden v. Maine.*, 527 U.S. 706, 713 (1999);

15

*Seminole Tribe v. Florida.*, 517 U.S. 44, 72–73 (1996) ("The Eleventh Amendment restricts the judicial power under Article III.").

In *Ex Parte Young*, 208 U.S. 123 (1908), the Supreme Court "recognized a narrow exception . . . that allows certain private parties to seek judicial orders in federal court preventing state executive officials from enforcing state laws that are contrary to federal law." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021). To satisfy *Ex Parte Young*, "a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Indus. Servs. Grp., Inc. v. Dobson*, 68 F.4th 155, 164 (4th Cir. 2023) (quotations omitted). Because the *Ex parte Young* exception is directed towards the state officers connected to the ongoing constitutional violation, the Court must find a "special relation" of "proximity to and responsibility for the challenged state action." *McBurney v. Cuccinelli*, 616 F.3d 393, 399 (4th Cir. 2010). Additionally, *Ex Parte Young* does not extend to suits against state officials for violations of their State's laws. *Hengle v. Treppa*, 19 F.4th 324, 347 (4th Cir. 2021).

This limitation on the use of *Ex Parte Young* for violation of state law is the core of Defendant's argument that North Carolina's sovereign immunity limits this Court's subject-matter jurisdiction. Defendants argue that Plaintiffs' claims are premised on the Board's alleged failure to follow state law when it declined to certify JFA despite it satisfying the statutory criteria.

Defendants' state-law argument is not persuasive. Plaintiffs allege ongoing violations of their First Amendment and Fourteenth Amendment rights. Any injunction issued by the Court would not enjoin "state officials on the basis of state law but rather on the basis of the First and Fourteenth Amendments." *N.C. Green Party v. N. C. State Bd. of Elections*, 619 F. Supp. 3d 547,

16

558 (E.D.N.C. 2022). Therefore, State sovereign immunity does not prevent this Court from hearing Plaintiffs' constitutional claims.

### (3) Abstention

Defendants argue that if the Court concludes it has subject-matter jurisdiction—it has—the Court should abstain according to the doctrine set forth in *Burford v. Sun Oil Co.*, 318 U.S. 315 (1943). The Court does not agree.

Federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). *Burford* abstention relaxes this otherwise "unflagging" mandate when adjudication might undermine the independence of state action on issues that are local and important to state's sovereignty. *Town of Nags Head v. Toloczko*, 728 F.3d 391, 395 (4th Cir. 2013). "This equitable decision balances the strong federal interest in having certain classes of cases, and certain federal rights, adjudicated in federal court, against the State's interest in maintaining "uniformity in the treatment of an essentially local problem . . . and retaining local control over difficult questions of state law bearing on policy problems of substantial public import." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728 (1996) (internal citation and quotation marks omitted).

Rarely is abstention favored. Indeed, *Burford* abstention applies in a small set of circumstances. Namely, "where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the results in the case then at bar; or (2) whether the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989). At bottom, the federal court must conclude that the "State's

17

interests are paramount and that dispute would best be adjudicated in a state forum." *Quackenbush*, 517 U.S. at 728.

*Burford* abstention is neither warranted nor appropriate here. For starters, Plaintiffs likely will not receive timely and adequate state-court review. The 19 August 2024 ballot-printing deadline is approaching fast. Too fast. Worse for abstention here, the State's interests do not outweigh the federal interests. Plaintiffs have alleged violations of their First and Fourteenth Amendment rights. These issues are not state-law issues but federal constitutional issues. *See N.C. Green Party*, 619 F. Supp. 3d at 560. What's more, "[i]n the context of a Presidential election, state-imposed restriction implicate a uniquely import national interest." *Anderson v. Celebrezze*, 460 U.S. 780, 794–95. Because Presidential elections will turn on voters beyond the State's boundaries, State's interests in regulating presidential elections are of "less import." *Id.* at 795; *see also Siegel v. LePore*, 234 F.3d 1163, 1174 (11th Cir. 2000) (rejecting abstention and remarking that "voting rights are particularly inappropriate for abstention"). True enough, the parties dispute the Board's authority to determine the sufficiency of petitions under North Carolina law. Even so, the potential effect resolving the federal questions presented would have on that policy is not enough to abstain. "[T]here is, of course, no doctrine requiring abstention merely because resolution of a federal question may result in the overturning of state policy." *Zablocki v. Rehail*, 434 U.S. 374, 379 n.5 (1978). But, as discussed below, it is not necessary for the Court to reach that question in order to provide relief for the Plaintiffs. Plaintiffs allege as-applied constitutional violations of their rights to associate and their rights to cast effective votes.

## B. Merits

A preliminary injunction is an extraordinary remedy intended to protect the status quo and prevent irreparable harm while a lawsuit is ongoing. *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). So the burden on the party seeking a preliminary injunction is "exceedingly high."

18

*Mahmoud v. McKnight*, 102 F.4th 191, 203 (4th Cir. 2024)."To obtain the 'extraordinary relief' of a preliminary junction, a plaintiff must establish the four so-called *Winter* factors: (1) that he is likely to success on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of the equities tip in his favor; and (4) that an injunction is in the public interest." *Frazier v. Prince George's Cnty*, 86 F.4th 537, 544 (2023) (citing *Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 20 (2008)).

Although each of these factors must satisfied considered independently, *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013), failing to satisfy any of them allows the district court to deny preliminary injunctive relief without evaluating the remaining factors. *Vitkus v. Blinken*, 79 F.4th 352, 361 (4th Cir. 2023); *see also Henderson for Nat. Lab. Rels Board v. Bluefield Hosp. Co., LLC*, 903 F.3d 342, 439 (4th Cir. 2018); *Frazier*, 86 F.4th at 544 ("*denying* a preliminary injunction only takes the rejection of a single factor.").

Defendants emphasize that Plaintiffs seek a more aggressive injunction—an injunction not to prevent future harm but to alter the status quo—and connect it to a higher burden. Preliminary injunctions can be characterized as either prohibitory or mandatory, the difference between them that "mandatory injunctions alter the status quo, whereas "prohibitory injunctions 'aim to maintain the status quo a prevent irreparable harm while a lawsuit remains pending.' " *League of Women Voters of N.C. v. North Carolina*, 768 F.3d 224, 236 (4th Cir. 2014). The status quo is "the last uncontested status between the parties which preceded the controversy." *Id.* (quotation marks omitted). This distinction is not without its critics. *See, e.g., Chicago United Industries, Ltd. v. City of Chicago*, 445 F.3d 940, 944 (7th Cir. 2006) (Posner, J.) ("Whether and in what sense the grant of [injunctive] relief would change or preserve some previous state of affair is neither here nor there. To worry these questions is merely to fuzz up the legal standard.)

What's more, there is good reason not to place a talismanic significance on the status quo here. The last uncontested status preceding the certification decision was JFA's status as a putative political party seeking certification. Considering the deadlines surrounding the 2024 general election, this is an untenable position to revert to. There is no middle ground. JFA is either in or out. Restoring JFA to its pre-certification status would not be a return to the status quo ante, rather it would be the current state of affairs under a different label. JFA, until certified, is not a new political party under North Carolina election law, as such its candidates cannot access the ballot. Finally, and most importantly, whatever force the distinction between prohibitory and mandatory injunctive relief has, mandatory injunctive relief is available where the moving party's "right to relief is indisputably clear." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 n.8 (4th Cir. 2019).

### (1) First Amendment

Plaintiffs have demonstrated that they are likely to succeed on the merits of their First Amendment claims. "[T]he constitutional right of citizens to create and develop new political parties. . . . derives from the First and Fourteenth amendments and advances the constitutional interest of like-minded voters to gather in pursuit of common political enders, thus enlarging the opportunities of all voters to express their own political preferences." *Norman v. Reed*, 502 U.S. 279, 288 (1992). "The First Amendment, as incorporated against the states by the Fourteenth Amendment, protects the rights of individuals to associate for the advancement of political beliefs and ideas." *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 716 (4th Cir. 2016).

Although "the Constitution grants the States power to legislate to regulation elections and ballot access," such "power is always limited by other specific provisions of the Constitution." *Williams v. Rhodes*, 393 U.S. at 29. Statutes restricting ballot access potentially burden two different rights: "the right of individuals to associate for the advance of political beliefs, and the

20

right of qualified voters, regardless of their political persuasion, to cast their votes effectively."

*Anderson*, 460 U.S. at 787 (quoting *Williams*, 393 U.S. at 23); *see also Kusper v. Pontikes*, 414 U.S. 51, 57 (1973) ("[U]nduly restrictive state election laws may so impinge upon freedom of association as to run afoul of the First and Fourteenth Amendments."). Both rights rank among our most precious freedoms. *Anderson*, 460 U.S. at 787. "No right is more precious is a free country than that of having a voice in the election of those who makes the laws under which, as good citizens, we must live. Other rights, even the most basic are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. at 29. When protecting those rights, "[it] is well-settled that a court has equitable authority to order that a candidate's name be placed on an election ballot." *Buscemi v. Bell*, 964 F.3d 252, (4th Cir. 2020).

The constitutionality of a ballot-access law is assessed under analytical framework set forth in *Anderson* and refined in *Burdick v. Takushi*, 504 U.S. 428 (1992). Under the *Anderson-Burdick* framework, courts

> must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendment that the plaintiff seeks to vindicate against the precise interest put forward by the State as justification for the burden imposed by its rule, taking into consideration the extent to which those interest make it necessary to burden the plaintiff's rights.

*Burdick*, 504 U.S. at 434 (quotation marks omitted). The *Anderson-Burdick* test is a "two-track approach." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 205 (2008) (Scalia, J., concurring). "This balancing test requires 'hard judgments'—it does no dictate 'automatic results.' " *Libertarian Party of Va.*, 826 F.3d at 716 (quoting *Anderson*, 460 U.S. at 788).

The first step is to decide if the challenged law imposes a severe burden on First Amendment rights. "When election laws 'impose a severe burden on ballot access,' those laws 'are subject to strict scrutiny,' and will be upheld only if the laws are 'narrowly drawn' to support

21

a compelling state interest." *Buscemi*, 964 F.3d at 263 (quoting *Pisano v. Strach*, 743 F.3d 927, 933 (4th Cir. 2014)); *see also S.C. Green Party v. S.C. State Election Comm'n*, 612 F.3d 752, 756 (4th Cir. 2010) ("Regulations that impose a severe burden on association rights are subject to strict scrutiny, and a court applying this level of review may uphold the regulation only if it narrowly tailored and advances a compelling state interest." (cleaned up) (quotations omitted)).

Defendants contend that "even if it must be assumed for the sake of the argument that the burden imposed [by the decision to deny JFA certification] was severe" the Board's decision is permissible under the *Anderson-Burdick* framework. [DE 30 at 24].

Independent of the Board's position for the sake of argument, the Court concludes that the Board's application of § 163-98 imposes a severe burden on Plaintiff's rights. "[T]he hallmark of a severe burden is exclusion or virtual exclusion from the ballot." *Libertarian Party of Ct. v. Lamont*, 977 F.3d 173, 177 (2d Cir. 2020) (quoting *Libertarian Party of Ky. v. Grimes*, 835 F.3d 570, 574 (6th Cir. 2016)). And "[t]he ability of a political party to appear on the general election ballot affects not only the party's rights, but also the First Amendment rights of voters." *Libertarian Party of Oh. v. Blackwell*, 462 F.3d 579, 588 (6th Cir. 2006) (citing *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214 (1986)). In declining to certify JFA as a new political party, the Board has categorically excluded JFA and its candidates from the ballot. As a result, the Board has precluded those voters who wish to associate with both from exercising their First Amendment right to do so. That is a severe burden on First Amendment rights.

On to step two. At this step, the Court must weigh the severe burden on Plaintiffs' right against the governmental interest offered by the Board as justifications for its application of N.C Gen. Stat. §§ 163-96 and 163-98. The Board argues that it took narrowly drawn measures to advance the North Carolina's compelling interests. Specifically, the State's interests in

22

"protect[ing] (1) [the] political processes from frivolous and fraudulent candidacies, (2) protecting individual voters from misuse of their endorsement via signatures on the petition, and (3) ensuring individual voters who signed the petition were properly informed, not deceive, and actually signed the petitions." [DE 30 at 24].

Plaintiffs respond that the Board lacks the statutory authority to advance these compelling interests. They point to § 163-96(c)'s language that the county boards of elections verify the petition signatures as excluding the Board from taking a qualitative approach to sufficiency. To be sure, § 163-96(a)(2) requires the Board to "determine the sufficiency of the petitions," but that role, they argue, is merely ministerial. The Board's only function is to ensure that the petitions meet the statutory requirements for validated signatures.

An exegesis of North Carolina's statutory scheme is unnecessary here. Although this Court has previously recognized that "North Carolina has compelling interests in authorizing the Board to properly determine the sufficiency of petitions submitted to it and to authorize the Board to investigate petition fraud," *N.C. Green Party*, 619 F. Supp. 3d. at 566, the Court need not reach the issue of Board's authority to conclude that the Board's application of § 163-96 was not narrowly drawn.

Section 163-96, as applied here, is not the least restrictive means to protect the state's interest. The Board asserts that its decision was supported "by the state's interest in ensuring that new party petitions contain a sufficient number of *valid* signatures" to meet the statutory threshold. [DE 30 at 24]. That interest, in turn, protects the political process from frivolous and fraudulent candidacies, protecting voters from misuse of their endorsement via petitions, and ensuring petition signers were properly informed and actually signed the petitions. *Id.* Furthermore, the Board's application of § 163-96 to JFA's petitions was a result of its finding that JFA submitted

23

only 4,000 signatures with outside signature gatherers submitting the rest; (2) its conclusion that a "substantial portion" of signers advised the Board they did not sign; (3) its conclusion that "many others" were not told of JFA's purpose; (4) that its subpoenas to outside signature gatherers did not yield the responses it desired; and (5) that the county election boards identified fraudulent signatures. The Board asserts that these "irregularities and failures to follow the statutory requirements were sufficient in scope to invalidate enough signatures to drop JFA below the required threshold, demonstrating they lacked the modicum of support required in this state to certify a new party." *Id.* at 25.

Start with the Board's concerns that JFA could account for around 4,000 of the over 17,000 validated signatures with remainder coming from POP. Where does the Board get this requirement? Certainly not § 163-96, which says nothing to that effect. Instead, it allows "any group of voters" to submit a petition for a new political party. Furthermore, Chairman Hirsch acknowledged there is nothing untoward or illegal with outside groups collecting signatures. House Test. 36:23–37:6. That said, the Board's emphasis on the new party itself collecting the signatures might stem the Board's concern that signers are informed of the "general purpose and intent of the new party." Even so, the Board's conclusion that JFA and POP's signature gatherers failed to inform voters is at odds with its typical practice. The Board usually relies on information submitted by the new political parties to substantiate the purpose and intent requirements. Cox Decl. ¶ 11. Such documents include training materials provided to signature gathers, including instruction or scripts that explain the purpose and intent. JFA and POP submitted materials detailing its efforts to comply with § 163-96's requirements, including those used by its petition circulators to NCSBE staff over a month before the certification decision.

Worse, the Board's conclusion that a "substantial portion" of signers advised the Board that they did not sign and that "many others" were not told of JFA's purpose does not withstand scrutiny. The Board relied on a survey completed by NCSBE staff that suffers from serious flaws. NCSBE staff first contacted the 66 voters who submitted affidavits stating they wished to withdraw their signatures. Of these 66, only 10 responded to staff inquiries. Then staff attempted to contact 250 signers. Only 49 responded. Of those 49, 18 stated they did not sign, 3 stated they could not remember, and 28 stated they did sign. Interviews of those 28 revealed that 15 of the signers were understood the purpose of the petition and that it was for the support of a new political party. What's more, of those 15 signers, 13 confirmed they were told the purpose and intent of the party with the other two stating they believed they were informed. To extrapolate from this survey that a "substantial portion" of signers did not sign and that "many others" were not informed of the purpose and intent defies reason. This survey—conducted months after petitions were collected and based on an exceedingly small percentage of petition-signers—is woefully insufficient to support the Board's decision as narrowly drawn. Instead, the Board could have simply excluded the signatures from petitioners who claimed they either didn't sign or were not told JFA's purpose and intent.

Likewise, the Board's decision to not certify JFA due to reports of fraudulent signatures was not narrowly drawn. The Board could have taken less restrictive measures to further that compelling interest. The Board concluded that the total number of validate petition signatures at 17,141, clearing the minimum signature requirement by 3,276 signatures. Cox. Decl ¶ 24. That total did not include the signatures reported as fraudulent. The Board, for example, could have subtracted *all* of the signatures from the four counties that it could confirm submitted reports of fraudulent signatures—Wake, Edgecombe, Beaufort, Watauga—and then consider the updated

total. Had the Board taken this less restrictive approach, the updated total of validated signatures would have been 15,273.[3] That updated total is well above the 13,865 validated signature threshold.

What's more, the Board claims that performed its duties guided by § 163-96(a)(2)'s command to determine the sufficiency "forthwith" which, according to the Board furthers the State's " ' interest in requiring parties to cement their slate of candidates in plenty of time the ensure accurate ballot printing.' " [DE 30 at 25] (quoting, *N.C. Green Party*, 619 F. Supp. 3d at 566). As in that case, the Court will assume without deciding that interest is compelling. *N.C. Green Party*, 619 F. Supp. 3d at 566 (recognizing the compelling interest yet concluding "the more than one month buffer between the July 1 deadline and the mid-August ballot printing deadline . . . is likely not narrowly drawn"). As in *N.C. Green Party*, the Court here concludes that Board's actions were not narrowly drawn to that interest. Board's self-imposed deadline of a 16 July 2024 certification decision is not narrowly drawn considering ballot preparation begins in mid-August and that JFA already submitted its slate of candidates weeks before the 16 July certification decision. There was ample time to further investigate JFA's petitions to determine their sufficiency. Instead, the Board conducted one flawed survey and extrapolated its conclusions to the rest of the signatures. Accordingly, § 163-96(a)(2), as applied, was not narrowly tailored to further that interest.

Narrow tailoring requires a scalpel; the Board used a blunt instrument. The Board effectively disenfranchised over 17,000 North Carolina voters who signed petitions to certify JFA

---

[3]County results available at
https://vt.ncsbe.gov/PetLkup/PetitionResult/?CountyID=0&PetitionName=NEW%20PARTY%3A%20JUSTICE%20FOR%20ALL%20PARTY%20OF%20NC (last visited Aug. 11, 2024).

26

as a new political party on flawed, highly suspect grounds. Accordingly, the Court concludes that Plaintiffs First Amendment claims are likely to succeed on the merits.

Given this conclusion, the remaining factors weigh in favor of preliminary relief. "In the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is inseparably linked to the likelihood of success on the merits of plaintiff's First Amendment claim." *Centro Tepeyac v. Montgomery Cnty.*, 772 F.3d 184, 191 (4th Cir. 2013); *Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (regarding irreparable injury, "the Supreme Court has explained that 'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury,'" (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976))). So too with the balance of the equities. "[A] state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restriction likely to be found unconstitutional." *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021). Such an injunction is also clearly in the public interest given that "upholding constitutional rights surely serves the public interest." *Centro Tepeyac*, 722 F.3d at 191 (quotations omitted).

### (2) Procedural due process

Plaintiffs also argue that the NCSBE violated their rights to procedural due process during the signature validation process. To succeed on a procedural due process claim in a run-of-the mill case, a plaintiff must show "(1) a cognizable liberty or property interest; (2) the deprivation of that interest by some form of state action; and (3) the procedures employed were constitutionally inadequate." *Kendall v. Balcerzak*, 650 F.3d 515, 528 (4th Cir. 2011). Here, Plaintiffs claim that JFA did not receive a full opportunity to defend its signatures; that JFA did not receive a fair hearing because the NCSBE ignored its timely submissions in response to multiple requests for information and documents; and that the NCSBE denied it an opportunity to cure any perceived deficiencies with its petitions. Because Plaintiffs bring an as-applied challenge to §§ 163-96 and

27

163-98, that is, a challenge to state election laws, the governing standard becomes more complicated.

Three other circuit courts who have faced this question have applied the *Anderson-Burdick* framework. *See Ariz. Democratic Party v. Hobbs* 18 F.4th 1179, 1195 (9th Cir. 2021); *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 233–35 (5th Cir. 2020); *New Ga. Project v. Raffensberger*, 976 F.3d 1278, 1282 (11th Cir. 2020); *but see Lichtenstein v. Hargett*, 83 F.4th 575, 593 (6th Cir. 2023) ("[W]e have left open whether *Anderson-Burdick* balancing should apply to other election-election related challenges, such as those asserting procedural-due-process claims.").

District courts in the Fourth Circuit have found the reasoning of those circuit courts persuasive and have applied the *Anderson-Burdick* framework to claims that election laws deprived procedural due process. *See Voto Latino v. Hirsch*, ---F. Supp. 3d ----, 2024 WL 230931, at *15–18 (M.D.N.C. Jan. 21, 2024); *Democracy N.C. v. Hirsch*, No. 1:23-CV-878, 2024 WL 1415113, at *8 (M.D.N.C. Apr. 8, 2024); *Democratic Party of Va. v. Bank*, 599 F. Supp. 3d 346, 361 (E.D. Va. 2022). While the Court finds the reasoning in these cases persuasive, it is not necessary for the Court to endorse one test over the other to resolve the motion before it.

The Court concludes that Plaintiffs have failed to satisfy the second *Winter* factor— irreparable harm. This factor requires the moving party to show that the moving party "is likely to suffer irreparable harm in the *absence of preliminary relief.*" *Di Biase*, 872 F.3d at 230 (emphasis added). That harm likely to occur without injunctive relief must also be irreparable, "meaning that it cannot be fully rectified by the final judgment after trial." *Mountain Valley Pipeline*, 915 F.3d at 216. In this case, assuming JFA was denied constitutionally sufficient process and Plaintiffs as mere petition signers could sue for those violations, the irreparable harm has already occurred. What's more, Plaintiffs are unlikely to suffer additional irreparable harm from procedural due

process violations given that the Board has made its certification decision. Whatever remedy Plaintiffs will be entitled to (if any), it's clear that immediate injunctive relief is not the only one that will suffice.

Because Plaintiffs have failed to show that they are likely to suffer irreparable harm in the absence of an injunction as a result of the alleged procedural due process violations, the Court need not analyze the remaining *Winter* factors to conclude that Plaintiffs have failed to satisfy their "exceedingly high" burden to show that a preliminary injunction is warranted. *Mahmoud*, 102 F.4th at 203; *Vitkus*, 79 F.4th at 362 ("[A] district court is entitled to deny preliminary injunctive relief on the failure of any single *Winter* factor, without fully evaluating the remaining factors."). The Court will, of course, still issue preliminary injunctive relief to remedy the ongoing violations of Plaintiffs' First Amendment rights.

## CONCLUSION

In sum, the Court GRANTS the intervenor's motion to intervene. [DE 44]. The Court GRANTS IN PART and DENIES IN PART Plaintiffs' motion for preliminary injunction. [DE 8]. For these reasons, the Court **ORDERS** as follows:

1.   Under Federal Rule of Civil Procedure 65(d)(1)(A), the Court issues this preliminary injunction for the reasons stated in this order, particularly this Court's conclusion that it has jurisdiction over this case and that plaintiffs have demonstrated that they are entitled to preliminary injunctive relief under the governing standard.

2.   The Court **ORDERS** Allan Hirsch, Jeff Carmon, Stacy Eggers IV, Kevin Lewis, and Siobhan O'Duffy Millen, in their official capacities as members of the North Carolina State board of Elections, and Karen Brinson Bell, in her official capacity as executive director of the North Carolina State Board of Elections, **TO CERTIFY** Justice For All of North Carolina as a new political party under N.C. Gen. Stat. § 163-96(a)(2).

3.   Allan Hirsch, Jeff Carmon, Stacy Eggers IV, Kevin Lewis, and Siobhan O'Duffy Millen, in their official capacities as members of the North Carolina State Board of Elections, and Karen Brinson Bell, in her official capacity as executive director of the North Carolina State Board of Elections, are hereby **ENJOINED** from

29

enforcing the 1 July filing deadline in N.C. Gen. Stat. § 163-98 as applied to the Justice For All party and its candidates.

4.    The Court **ORDERS** that Allan Hirsch, Jeff Carmon, Stacy Eggers IV, Kevin Lewis, and Siobhan O'Duffy Millen, in their official capacities as members of the North Carolina State Board of Elections, and Karen Brinson Bell, in her official capacity as director of the North Carolina State Board of Elections, **SHALL** include on North Carolina's 5 November 2024 general election ballot the names of JFA candidates who comply with the terms of this order and who are qualified for the office they seek. Hirsch, Carmon, Eggers, Lewis, and O'Duffy Millen, in their official capacities as members of the North Carolina State Board of Elections, and Brinson Bell, in her official capacity as executive director the North Carolina State Board of Elections, **SHALL** take any and all other actions necessary to that end.

5.    The Court **RETAINS** jurisdiction to enforce the terms of this order.

6.    The Court **RETAINS** jurisdiction over all claims by plaintiffs to grant such further and additional relief as the court deems appropriate, including declaratory relief, injunctive relief, and an award of reasonable attorney's fees and litigation costs under 42 U.S.C. § 1988.

7.    The Clerk of Court is **DIRECTED** to file Intervenor's proposed complaint. [DE 44-1].

SO ORDERED, this _12_ day of August 2024.


_Terrence Boyle_
TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE